IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| APRIL CLARK | ) | CASE NO.  1:20-CCV-00679-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |

Plaintiff April Clark ("Plaintiff" or "Clark") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

## I.     PROCEDURAL HISTORY

In January 2017, Clark filed an application for POD and DIB, alleging a disability onset date of December 31, 2016 and claiming she was disabled due to: hereditary idiopathic peripheral neuropathy;

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

atherosclerosis of coronary artery; dyslipidemia; acute myocardial infarction; constant shortness of breath; migraines; and heart spasms.  (Transcript ("Tr.") at 65, 105-06.)  The application was denied initially and upon reconsideration, and Clark requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 65.)

On September 27, 2018, an ALJ held a hearing, during which Clark, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On January 17, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 65-79.)  The ALJ's decision became final on February 6, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On March 31, 2020, Clark filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17-18.)  Clark asserts the following assignments of error:

(1)     The ALJ erred when he rejected the medical opinions provided by the claimant's treating physician;

(2)     The ALJ erred when the decision failed to identify how much weight it assigned to the medical opinion of the claimant's treating physician; and

(3)     The ALJ erred in finding that Plaintiff's complaints were not consistent with the evidence.

 (Doc. No. 17.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Clark was born in May 1970 and was 48 years-old at the time of her administrative hearing (Tr. 78), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  She

2

has at least a high school education and is able to communicate in English.  (Tr. 78.)  She has past relevant

work as a loan officer, branch manager, rental manager, and food and beverage manager.  (*Id.* at 77.)

**B.  Relevant Medical Evidence[2]**

On December 23, 2016, Clark went to the emergency room with complaints of severe chest pain.

(*Id.* at 382.)  Clark reported experiencing severe substernal chest pain, shortness of breath, and numbness

and tingling in her upper extremities while at work.  (*Id.*)  Upon examination, Clark was asymptomatic.

(*Id.*)  A CT scan revealed no pulmonary embolism, an EKG revealed no "acute specific ST changes,"

although Clark was pain free during the EKG, and an x-ray revealed mild enlargement of the heart.  (*Id.* at

384-86, 389.)  Treatment providers administered aspirin and nitroglycerin.  (*Id.* at 380.)  On December 24,

2016, treatment providers discharged Clark in satisfactory condition with a diagnosis of non-ST segment

elevation myocardial infarction.  (*Id.*)  Treatment providers instructed Clark to take atorvastatin,

metoprolol, and Lipitor and follow up with the cardiology clinic in two to four weeks.  (*Id.*)  Treatment

notes reflect that Clark was told she could shower, return to school or work, and drive.  (*Id.* at 381.)

On December 31, 2016, Clark saw her primary care physician, Dr. George Adams, for follow up

after her heart attack.  (*Id.* at 360.)  Clark reported continuing fatigue, some arm discomfort, and some

burning in her upper arms.  (*Id.*)  Dr. Adams diagnosed Clark with atherosclerosis of coronary artery of

native heart with angina pectoris, prescribed nitroglycerin, and referred Clark to the cardiology clinic.  (*Id.*

at 360, 362.)

On January 9, 2017, Clark saw Dr. Adams for follow up regarding her chest pain.  (*Id.* at 359.)  Clark

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

reported continuing chest pain, burning in her left arm, vertigo, and shortness of breath with exertion daily. (*Id*.) Clark told Dr. Adams she took nitroglycerin a few times, which seemed to help. (*Id*.) Clark also reported a flare up of her "long-standing neuropathy," with symptoms of increased leg pain and insomnia. (*Id*.) Dr. Adams diagnosed arthersclerosis with angina pectoris, dyslipidemia, and hereditary and idiopathic peripheral neuropathy. (*Id*. at 359-60.) Dr. Adams continued Clark's medication regimen. (*Id*. at 360.)

On January 14, 2017, Clark went to the Mercy Hospital Emergency Department with complaints of chest pain that had persisted for several days. (*Id*. at 293.) Clark reported the pain being like when she suffered a heart attack, and it persisted despite her having taken six nitroglycerin tablets. (*Id*.) Clark described the pain as dull and crushing and said the pain had lasted for the past six hours. (*Id*.) An EKG revealed a normal sinus rhythm but an incomplete right bundle branch block, as well as an inferior infarct with ST segment depression consistent with mild ischemic inferior changes. (*Id*. at 295.) Clark's CT scan and x-ray were normal. (*Id*. at 295, 302.) A cardiac catheterization showed mild coronary artery disease. (*Id*. at 302.) Treatment providers diagnosed Clark with unstable angina. (*Id*. at 296.)

On January 18, 2017, Clark saw Dr. Adams for follow up from her recent emergency room visit. (*Id*. at 356.) Clark reported an episode of chest pain after leaving the hospital that was relieved with nitroglycerin. (*Id*.) Clark told Dr. Adams she had not had any pain in the past three days. (*Id*.) Dr. Adams "urged" Clark to follow up with cardiology and neurology. (*Id*. at 357.)

On January 23, 2017, Clark saw neurologist Dr. Zarmeneh Aly for follow up. (*Id*. at 352.) Clark reported chest tightness and numbness in the shoulders and upper arms for the past two months. (*Id*. at

4

353.)  These episodes also consisted of sweating, dizziness, shortness of breath, numb and swollen hands, and blurry vision.  (*Id.*)  These episodes occurred every few days.  (*Id.*)  Nitroglycerin relieved her symptoms.  (*Id.*)  Clark reported having no symptoms while on bedrest.  (*Id.*)  Clark stated she could "barely walk" if she did not take her nortriptyline.  (*Id.*)  Clark also complained of dry mouth, dry eyes, alternating constipation/diarrhea, and constant numbness and mild paresthesias in her feet.  (*Id.*)  Clark told Dr. Aly she had been instructed to follow up with neurology to rule out neuropathy as a cause for her symptoms.  (*Id.*)

On examination, Dr. Aly found normal strength, with reflexes 2/4 except for the ankles, which had trace reflexes bilaterally.  (*Id.* at 354.)  Dr. Aly found decreased pinprick sensation in the feet bilaterally and the left arm, blunting of superficial pain over the plantar surfaces of the feet, and mildly decreased vibratory sensation in the bilateral toes.  (*Id.*)  Clark's gait was normal.  (*Id.* at 355.)  Dr. Aly opined that while Clark's symptoms did not seem consistent with neurological causes, "her persisting left arm weakness [was] a little concerning."  (*Id.*)  Dr. Aly further opined Clark's decreased ankle reflexes, pinprick sensation in her feet, and vibratory sensation in her toes were signs of large fiber neuropathy.  (*Id.*)  Dr. Aly recommended an EMG of Clark's left arm to rule out any cervical radiculopathy.  (*Id.*)

On January 26, 2017, Clark consulted with cardiologist Raul Schwartzman, M.D. (*Id.* at 349.)  Clark reported no cardiac symptoms at the time.  (*Id.*)  Clark reported concerns about shortness of breath, even with mild exertion.  (*Id.* at 350.)  Clark told Dr. Schwartzman she was still experiencing chest pain episodes, but the pain responded to nitroglycerin.  (*Id.*)  Dr. Schwartzman reviewed Clark's January 26, 2017 echocardiogram and January 16, 2017 heart catherization.  (*Id.* at 352.)  Dr. Schwartzman opined

5

that Clark's prognosis was good, continued some of her medications, reduced another, added a low dose of isosorbide mononitrate, and directed her to return in six months or earlier if needed.  (*Id.*)

On February 16, 2017, Clark saw Dr. Adams to be cleared to return to work.  (*Id.* at 345.)  Clark reported she had not experienced any chest pain since mid-January.  (*Id.*)  Clark told Dr. Adams she had been exercising up to eighteen minutes before getting winded.  (*Id.*)  Clark reported shortness of breath with exertion, like climbing the stairs or doing laundry.  (*Id.*)  Dr. Adams noted Clark was able to exercise without chest pain, although she did get short of breath.  (*Id.*)  Clark decided she would return to work the following Monday and would see how she did.  (*Id.*)  Dr. Adams noted Clark's dyslipidemia was under "suboptimal control."  (*Id.* at 347.)

On February 23, 2017, Clark went to the emergency room at Ahuja Medical Center with complaints of chest pain.  (*Id.* at 398.)  Clark reported left-sided chest pain that started in the morning while at work, with associated shortness of breath, nausea, and dizziness.  (*Id.* at 399.)  Treatment providers administered one nitroglycerin tab, which resolved Clark's chest pain.  (*Id.*)  Clark's EKGs were normal, as were her troponin levels.  (*Id.* at 399-400.)  Treatment providers discharged Clark home in stable condition.  (*Id.* at 399.)

On March 15, 2017, Clark saw Elizabeth Crespo, CNP, for follow up after her most recent emergency room visit.  (*Id.* at 505.)  Clark reported two episodes of chest pain and one emergency visit since her last appointment in January.  (*Id.*)  Clark denied syncope, claudication, leg swelling, cough, and wheezing.  (*Id.*)  Clark told Crespo she had taken six nitroglycerin tablets since February 23, 2017.  (*Id.*)  Clark also complained of severe back pain, impacting her sleep, and daily headaches/migraines since

6

starting Imdur.  (*Id.*)  On examination, Crespo found regular heart rhythm, S1 and S2 normal, no heaves, thrills, or murmurs, intact distal pulses bilaterally, and a normal gait.  (*Id.* at 506.)  Crespo adjusted Clark's medications.  (*Id.*)

On April 25, 2017, Clark saw CNP Crespo for follow up.  (*Id.* at 509.)  Clark reported she had been restarted on metoprolol after experiencing heart palpitations.  (*Id.*)  Clark complained of heart fluttering with associated lightheadedness and dizziness that lasted for minutes and was unrelated to activity.  (*Id.*)  Clark also reported chest tightness without any spasm.  (*Id.*)  Clark denied syncope, claudication, leg swelling, cough, and wheezing.  (*Id.*)  On examination, Crespo found regular heart rhythm, S1 and S2 normal, S4 present, no heaves, thrills, or murmurs, intact distal pulses bilaterally, and a normal gait.  (*Id.* at 510.)  Crespo increased Clark's metoprolol.  (*Id.*)

On June 27, 2017, Clark saw Robert W. Shields, M.D., for a neurological consultation "regarding concerns for dysautonomia causing cardiac symptoms."  (*Id.* at 463.)  Clark reported chest tightness into her arms, dizziness, lightheadedness, and shortness of breath.  (*Id.*)  Clark estimated having four to six severe spells and 10 mild spells.  (*Id.*)  Most of these spells were unrelated to exercise or stress.  (*Id.*)  Clark reported her last severe spell was two months ago.  (*Id.*)  Clark complained of shortness of breath with even mild exertion, such as carrying a laundry basket up the stairs.  (*Id.*)  Clark also reported "orthostatic lightheadedness, assoc with fluttering of heart rate" daily, 50% of the time, but less if she moved more slowly.  (*Id.*)  Clark complained of reduced walking tolerance, estimating she could walk ten minutes or so, and that standing still was difficult.  (*Id.*)  Clark reported "modest improvement" with metoprolol and nifedipine.  (*Id.* at 464.)

On examination, Dr. Shields found normal mental status and cognition, as well as normal speech and language.  (*Id.* at 465.)  A motor examination revealed normal range of motion, tone, bulk, and power throughout, as well as normal rapid finger movements bilaterally.  (*Id.*)  Dr. Shields found sensation intact in the upper and lower extremities, normal gait, and negative Romberg's sign.  (*Id.*)  Dr. Shields noted Clark could walk on heels and toes without difficulty, as well as rise from a seated position with her arms crossed without difficulty.  (*Id.*)  Dr. Shields opined that Clark's "constellation of symptoms is suspicious for generalized dysautonomia, most likely an autonomic neuropathy," and her cardiovascular symptoms were suspicious for postural orthostatic tachycardia syndrome.  (*Id.*)  Dr. Shields thought Clark's underlying idiopathic small fiber neuropathy could represent a contributing factor.  (*Id.*)  Dr. Shields recommended tilt table testing, QSART, and laboratory testing.  (*Id.* at 465-66.)  Clark was to follow up in six months.  (*Id.* at 466.)

On July 10, 2017, Clark saw Dr. Schwartzman for follow up regarding her chest pain.  (*Id.* at 515.)  Clark complained of ongoing episodes of chest pain, lasting up to two minutes, although the intensity of these episodes had lessened since starting nifedipine.  (*Id.*)  Clark reported she had not been taking nitroglycerin because she felt the pain was less intense.  (*Id.*)  Clark told Dr. Schwartzman she felt exhausted after these episodes.  (*Id.*)  Clark also reported shortness of breath with minimal exertion.  (*Id.*)  Although Clark also complained of daily heart palpitations, Dr. Schwartzman noted her Holter was normal.  (*Id.*)  Clark denied orthopnea, cough, edema, PND, and syncope.  (*Id.*)  On examination, Dr. Schwartzman found regular rhythm, PMI was not displaced, no RV heave, normal S1 and S2, no S3 or S4, and no murmurs, gallop, or rub.  (*Id.* at 516.)  The results from Clark's Holter showed sinus rhythm with

periods of sinus tachycardia, "[v]ery rare ventricular ectopic singles and one couplet," and "[v]ery rare supraventricular ectopic singles and one couplet." (*Id.* at 517.) Clark did not note any symptoms in the symptom diary, and she did not activate the patient event marker. (*Id.*) Clark was to return in six months. (*Id.* at 518.)

On July 13, 2017, Clark saw cardiologist Sung Hee L. Cho, M.D., for follow up. (*Id.* at 524.) Dr. Cho noted Clark presented with "[a]ngina pectoris with normal coronary arteriogram" and "[a]cute non-ST segment elevation myocardial infarction NSTEMI." (*Id.* at 525.) Clark reported having started nifedipine in March 2017 that relieved, but did not resolve, her chest pain. (*Id.*) Clark told Dr. Cho her chest pain was never caused by exertion but was rather brought on by emotional stress and anger. (*Id.*) On examination, Dr. Cho found normal heart sounds at S1 and S2, absent S3 and S4, and no murmurs. (*Id.* at 528.) Clark's cardiac MRI showed no evidence of myocarditis. (*Id.*) Clark's EKG was normal, although her ECG was abnormal. (*Id.* at 547.) Dr. Cho discussed a repeat heart catherization with Clark, but given her symptom improvement, Dr. Cho decided to hold off for the time being. (*Id.* at 528.) Dr. Cho stopped Clark's metoprolol and increased her nifedipine and Lipitor. (*Id.*) Clark was to follow up in three months. (*Id.*)

On July 15, 2017, Clark saw Dr. Adams for follow up and to renew her medical leave for work. (*Id.* at 758.) Dr. Adams noted Clark had been off work since February and continued to have "an unusual chest pain syndrome." (*Id.*) Clark reported her chest pain was not as severe, but it was still occurring, and was relieved by nitroglycerin. (*Id.*) Clark complained of associated shortness of breath, palpitations, and fatigue. (*Id.*) Dr. Adams noted Clark's vitamin B6 levels were low, but when Clark started taking B6

9

tablets she had a reaction consisting of tingling of her hands and lips, chest pain, shortness of breath, eyelid swelling, and erythema of her face, arms, and feet.  (*Id.*)  The pharmacist recommended she take two Benadryl.  (*Id.*)  While Clark's symptoms had subsided, she still felt "somewhat dizzy."  (*Id.*)  Dr. Adams noted Clark was "unable to work as a result of her ongoing symptoms."  (*Id.*)  On examination, Dr. Adams found normal sinus rhythm, no murmurs, thrills, or clicks, no edema, cyanosis, or deformity of the extremities, and "fewer erythematous blotches" on Clark's ankles and feet.  (*Id.* at 760.)  Dr. Adams directed Clark to continue her nitroglycerin.  (*Id.*)

On July 17, 2017, Dr. Adams completed a Medical Source Statement regarding Clark's physical capacity.  (*Id.* at 520-21.)  Dr. Adams opined Clark could lift five pounds occasionally and zero pounds frequently, stand and/or walk for a total of 30 minutes in an eight-hour work day and 30 minutes without interruption, standing and walking for a total of 30 minutes in an 8-hour workday, and sit for a total of 4 hours in an eight-hour work day, two hours without interruption.  (*Id.* at 520.)  Dr. Adams further opined Clark could "rarely to never" climb, balance, stoop, crouch, kneel, and crawl.  (*Id.*)  Dr. Adams based these limitations on Clark's chest pain, shortness of breath, palpitations, and numbness of extremities. (*Id.*)

Dr. Adams further opined Clark could rarely reach, push, pull, handle, or finger.  (*Id.* at 521.)  She could never be around heights, moving machinery, temperature extremes, pulmonary irritants, and noise. (*Id.*)  Dr. Adams based these limitations on Clark's numbness and tingling of extremities, chest pain, and shortness of breath.  (*Id.*)  Dr. Adams opined Clark would need to alternate between sitting, standing, and walking at will, and needed to elevate her legs to 45 degrees at will.  (*Id.*)  Dr. Adams also opined Clark

10

experienced severe pain that would interfere with her concentration, take her off task, and cause absenteeism.  (*Id.*)  Clark also required additional unscheduled rest periods outside of normal breaks. (*Id.*)  Finally, Dr. Adams opined Clark was "unable to work an 8-hour workday."  (*Id.*)

On August 7, 2017, Clark saw Erin Kearns, CNP, for ongoing management of her cardiovascular risk factors.  (*Id.* at 544-45.)  Clark reported her chest pain decreased when she started nifedipine in March 2017 and decreased further when her dose was increased to 60 mg a day.  (*Id.* at 545.)  However, Clark developed increased shortness of breath, edema, and redness in her leg, and her dose was decreased on August 4, 2017.  (*Id.*)  While Clark's other symptoms improved, her chest pain worsened again.  (*Id.*) Clark also complained of an irregular heartbeat that felt like fluttering a couple of times a day.  (*Id.*)  Clark told Kearns this fluttering lasted for a few seconds and then resolved on its own.  (*Id.*)  Clark rated her pain at a 6/10.  (*Id.*)  Clark reported her pain could be triggered by emotional stress.  (*Id.* at 546.)  Clark also complained of leg edema that resolved overnight.  (*Id.*)  Kearns noted Clark's July 13, 2017 EKG showed normal sinus rhythm and that her ECG was abnormal.  (*Id.* at 547.)  Kearns continued Clark's nifedipine and restarted her on Atorvastatin.  (*Id.* at 548.)  Kearns noted they would discuss exercise after Clark's chest pain improved.  (*Id.*)  Later, after following up with Dr. Cho, Kearns also prescribed Ranexa twice daily for chest pain.  (*Id.* at 549.)

On October 4, 2017, Clark saw CNP Kearns for follow up.  (*Id.* at 565-66.)  Clark reported her palpitations remained unchanged and that she got dizzy when laughing.  (*Id.*)  Clark told Kearns she felt like she was going to pass out when this happened.  (*Id.*)  Clark also reported falling twice since her last visit as a result of her neuropathy.  (*Id.*)  Clark rated her chest pain as a 3/10.  (*Id.*)  Clark told Kearns the

11

chest pain and palpitations occur together, and she then became short of breath.  (*Id.* at 567.)  Clark also complained of discomfort at rest.  (*Id.*)  Clark reported increased fatigue since starting Ranexa, although the chest pain was happening less often and was less severe.  (*Id.*)  Clark also complained of leg edema after being on her feet for long periods of time.  (*Id.*)  Clark told Kearns the swelling resolved with elevating her legs or overnight.  (*Id.*)  Kearns ordered Clark to continue her medications and start cardiac rehabilitation.  (*Id.* at 569.)  Kearns suggested Clark follow up with Dr. Shields regarding her dizziness while laughing.  (*Id.* at 570.)

On October 19, 2017, as part of her cardiac rehabilitation program, Clark underwent an exercise capacity test.  (*Id.* at 580.)  Clark achieved a peak functional capacity of 5.3 METS and a peak heart rate of 137 beats per minute.  (*Id.*)  Gordon Blackburn, Ph.D., terminated the test prematurely because of Clark's general fatigue and shortness of breath.  (*Id.*)  Dr. Blackburn concluded that Clark's functional capacity "was significantly impaired (30%) for her age."  (*Id.*)  Dr. Blackburn also noted "blunted chronotropic response" and "low heart rate recovery."  (*Id.*)  Dr. Blackburn recommended aerobic activity three times a week, once a day, on nonconsecutive days, increasing by one session a week every four weeks to get to a goal of five times a week.  (*Id.*)

On November 29, 2017, Clark saw Ana Tomic, CNP, for follow up regarding her chest pain.  (*Id.* at 600-01.)  Clark rated her pain at a 3/10 and described it as constant pressure that lasted all day.  (*Id.* at 601.)  Clark told Tomic that the other evening she was falling asleep when she felt intense 10/10 chest pressure that she described as pulling with numbness in her arms and hands and shortness of breath.  (*Id.*)  Clark drank baking soda water, which did not relieve the pain.  (*Id.*)  Clark reported another episode of the

same discomfort the night before, took Tums, which provided no relief, and then took two nitroglycerin pills, which provided complete relief.  (*Id.*)  Tomic noted Clark's blood pressure had been trending upwards the past few days.  (*Id.*)  Clark also reported shortness of breath with minimal exertion, which was a new symptom, as she usually only got shortness of breath with heavier exertion.  (*Id.*)  Tomic noted Clark was visibly short of breath while walking.  (*Id.* at 602.)  On examination, Tomic found the intensity and persistent nature of Clark's symptoms concerning, even though her ECG remained relatively unchanged from her previous ECG.  (*Id.* at 604.)  After consulting with Dr. Huang, Kearns determined Clark should undergo further evaluation in the emergency room.  (*Id.*)  After examination in the hospital, Clark was "ruled out and sent home."  (*Id.* at 611.)

On December 5, 2017, Clark saw Dr. Adams for follow up after being hospitalized for two nights while undergoing cardiac testing after experiencing chest pain.  (*Id.* at 770.)  Dr. Adams noted Clark was ruled out for a myocardial infarction.  (*Id.*)  Clark told Dr. Adams she was still having chest pressure, dizziness, shortness of breath, fatigue, and tingling of her hands and feet.  (*Id.*)  Clark reported being very inactive and being unable to do much around the house.  (*Id.*)  Clark said she was trying to exercise but was making very little progress.  (*Id.*)  Clark told Dr. Adams she had an appointment with cardiology the following week.  (*Id.*)  Clark also complained of poor sleep and being frequently awoken by pain.  (*Id.*)  Clark reported her last episode of chest pain resolved with nitroglycerin.  (*Id.*)  Dr. Adams' examination revealed normal findings, including no edema of the extremities.  (*Id.* at 772-73.)  Dr. Adams instructed Clark to continue her current medications and follow up with cardiology.  (*Id.* at 773.)

On December 13, 2017, Clark saw Dr. Cho for follow up of her coronary spasm.  (*Id.* at 610-11.)

13

Dr. Cho noted Clark had been doing well until late November when she went to the emergency room for increasing chest pain. (*Id.* at 611.) Treatment providers "ruled out" Clark and sent her home. (*Id.*) Clark told Dr. Cho she had not had any chest pain since then. (*Id.*) On examination, Dr. Cho found normal heart sounds at S1 and S2, absent heart sounds at S3 and S4, and no murmurs. (*Id.* at 613.) Dr. Cho adjusted Clark's medication. (*Id.* at 614.)

On January 22, 2018, Clark saw exercise physiologist Michael Crawford for review of her exercise program as part of her cardiac rehabilitation. (*Id.* at 620.) Clark reported exercising three to five times a week, although she was doing very little exercise because of her shortness of breath and dizziness. (*Id.* at 621.) While Clark had been exercising five times a week, she was down to three times a week because of her symptoms and a lack of transportation. (*Id.*) Clark reported using the semi-recumbent and upright cycle for up to 25 minutes with a heart rate of around 125 beats per minute while pedaling slowly. (*Id.*) Clark told Crawford she felt very tired when exercising. (*Id.*) Clark described her current cardiac symptoms as chest tightening and fluttering or "jumping" feeling that occurred occasionally and resolved on its own. (*Id.*) Clark also reported facial flushing and constant lightheadedness/dizziness that had gotten worse when providers increased her dose of nifedipine. (*Id.*) Treatment notes reflect a pharmacologic nuclear stress test in November 2017 was negative for ischemia. (*Id.*) Crawford modified Clark's exercise plan to consist of three to four times a week using the semi-recumbent cycle or the pool. (*Id.* at 622-23.)

On March 12, 2018, Dr. Adams wrote a letter for an application for disability placards that stated Clark could not walk without the use of or assistance from a device as a result of her chronic neuropathy.

14

(*Id.* at 556.)  The placard was to be good for five years.  (*Id.*)

On April 25, 2018, Clark saw Dr. Adams for complaints of anxiety and depression.  (*Id.* at 796.)

Clark described her symptoms as consisting of agitation and weakness.  (*Id.*)  Clark reported these issues

began about a month ago and had been getting worse.  (*Id.*)  Dr. Adams wrote:

> Patient continues to be disabled secondary to POTS syndrome and Dysautonomia.
> She spends most of her days in bed, unable to stand, walk for more than 15
> minutes.  She has chronic tachycardia, orthostasis, chest pain, neuropathic
> symptoms, weakness of extremities.  She's becoming very depressed about all of
> this because of her obvious loss of quality of life.  She is being followed by
> multiple consultants at Cleveland [C]linic Foundation, including neurology,
> cardiology, neuromuscular.  She's had a multitude of tests, attempts at cardiac
> rehabilitation and has been unable to participate because of her persistent
> tachycardia.  Patient in the office today having chest pain with nausea and
> vomiting, responded to sublingual nitroglycerin.  She is teary and upset describing
> this ordeal and especially frustrated with the insurance company requesting
> repeated disability forms.

(*Id.*)  Dr. Adams' examination revealed normal findings, including no edema.  (*Id.* at 799.)  Clark's

diagnoses included postural orthostatic tachycardia syndrome (POTS), hereditary and idiopathic

peripheral neuropathy, dyspnea on exertion, tachycardia, dysautonomia, and reactive depression.  (*Id.* at

799-800.)  Regarding her POTS, Dr. Adams wrote:

> This is getting worse, patient is totally disabled, unable to get out of bed and stand
> or walk for more than 15 minutes or do any physical activity without chest pain,
> fatigue, tachycardia, hypotension, lightheadedness, weakness of extremities.
> She's been on disability since December 2016 and I expect this will be long-term.

(*Id.* at 799.)  Dr. Adams noted Clark's neuropathy caused weakness and neuropathic symptoms in her

upper and lower extremities.  (*Id.*)  Dr. Adams stated even minimal exertion caused shortness of breath,

tachycardia, chest pain, and lightheadedness.  (*Id.* at 800.)  With respect to Clark's depression, Dr. Adams

15

opined Clark was "understandably depressed by her situation and significant loss of quality of life." (*Id.*)
Dr. Adams advised Clark to increase her nortriptyline to 50 mg twice a day. (*Id.*)

On April 28, 2018, Clark went to the Mercy Hospital emergency department with chest pain and
palpitations. (*Id.* at 692.) Clark also reported nausea/vomiting and dizziness. (*Id.*) Clark told providers
she had a gradual onset of moderate, pressure-like pain since Wednesday afternoon that became constant.
(*Id.*) While nitroglycerin relieved the pain, after the nitroglycerin the pain came back immediately. (*Id.*)
At the time of treatment, Clark endorsed chest pain and dizziness but denied palpitations and leg swelling.
(*Id.* at 693.) Clark's EKG revealed sinus tachycardia, a heart rate of 109, normal axis, normal intervals,
and no ST changes. (*Id.* at 695.) Treatment providers administered medication, including morphine,
zofran, and Lopressor, which resulted in complete relief of Clark's chest pain. (*Id.*) On reassessment,
Clark's heart rate was in the 80s. (*Id.*) Treatment providers suspected Clark had a likely coronary
vasospasm as opposed to a syndrome of inappropriate tachycardia. (*Id.*) Although treatment providers
offered to admit Clark, she declined, saying she wanted to go home and follow up with cardiology. (*Id.*)
Treatment providers restarted Clark on metoprolol and instructed her to follow up with cardiology. (*Id.*)

On May 15, 2018, Dr. Adams provided a second Medical Source Statement regarding Clark's
physical capacity. (*Id.* at 654-55.) Dr. Adams opined Clark could occasionally lift five pounds, stand and
walk for a total of two hours in an eight-hour workday, 15 minutes without interruption, and sit for a total
of two hours in an eight-hour workday, 30 minutes without interruption. (*Id.* at 654.) Dr. Adams further
opined Clark could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push, pull, handle, or finger.
(*Id.* at 654-55.) Clark could never be around heights, moving machinery, temperature extremes,

16

pulmonary irritants, and noise.  (*Id.* at 655.)  Dr. Adams noted a cane, walker, and wheelchair had been prescribed.  (*Id.*)  Dr. Adams again opined Clark would need to alternate between sitting, standing, and walking at will, and needed to elevate her legs to 45 degrees at will.  (*Id.*)  Dr. Adams also again opined Clark experienced severe pain that would interfere with her concentration, take her off task, and cause absenteeism.  (*Id.*)  Clark also required additional unscheduled rest periods outside of normal breaks.  (*Id.*)  Dr. Adams again opined Clark was unable to work an eight-hour workday, and stated she spent most of her days in bed and was unable to stand or walk for more than fifteen minutes.  (*Id.*)  Dr. Adams wrote "See notes" for the medical findings supporting his assessment.  (*Id.* at 654-55.)

On June 18, 2018, Clark saw Dr. Cho for follow up.  (*Id.* at 888-89.)  Dr. Cho noted Clark had been doing well but then went to the emergency room for chest pain in April 2018, where she was "diagnosed with inappropriate ST and discharged on BBErs."  (*Id.* at 889.)  Dr. Cho noted the medication resolved Clark's chest pain.  (*Id.*)  Clark denied chest pain, leg swelling, hypertension, and palpitations.  (*Id.* at 891.)  On examination, Dr. Cho found heart sounds normal at S1 and S2, absent at S3 and S4, and no murmurs.  (*Id.*)  Dr. Cho increased Clark's nifedipine and noted Clark was still on Ranexa.  (*Id.* at 892.)  Dr. Cho noted Clark had started a low dose of Lopressor which seemed to have resolved her chest pain. (*Id.*)

On July 11, 2018, Clark's neurologist, Dr. Shields, wrote a letter regarding Clark's diagnoses and treatment.  (*Id.* at 906.)  Dr. Shields wrote that Clark's "evaluation disclosed significant orthostatic tachycardia and hemodynamic studies disclosed significant venous pooling with a tendency for orthostatic hypotension."  (*Id.*)  A skin biopsy confirmed underlying small fiber neuropathy.  (*Id.*)  Despite treatment

17

for a vitamin B6 deficiency and "aggressive" management with non-pharmacological interventions and a low dose beta blocker, Clark's neuropathy symptoms persisted.  (*Id.*)  Dr. Shields opined Clark "remains disabled for any and all types of meaningful employment" and estimated her disability would last at least another year.  (*Id.*)

On July 31, 2018, Clark saw Dr. Adams for follow up.  (*Id.* at 933.)  Clark reported her chest pain continued and she was using nitroglycerin more often.  (*Id.*)  Clark told Dr. Adams the pain radiated to her neck, shoulders, and back and caused nausea.  (*Id.*)  Dr. Adams noted:

> Symptoms persist, no real significant change.  Her activities are limited.  Is able to get up and about for short periods of time, but is exhausted after doing so.  She is [sic] been having an issue with lower extremity edema for some time, this is getting worse.  She has been on salt tablets 3 times a day to support her blood pressure, but has to cut down to one a day because of the fluid retention.  She continues to have shortness of breath and intermittent chest pain as before, no real change.  She continues to follow with multiple consultants at CCF.

(*Id.*)  Dr. Adams described Clark's edema as a "chronic problem" that began over a year ago and that occurred "constantly."  (*Id.*)  Dr. Adams listed associated symptoms as chest pain, fatigue, headaches, nausea, neck pain, and swollen glands.  (*Id.*)  Her symptoms were aggravated by walking.  (*Id.*)

On August 23, 2018, Dr. Adams completed a third Medical Source Statement regarding Clark's physical capacity.  (*Id.* at 907-09.)  Dr. Adams opined Clark could occasionally lift 20 pounds and frequently lift 10 pounds, she could stand and walk for a total of four hours in an eight-hour work day, 15-30 minutes without interruption, and sit for a total of eight hours a day, two hours without interruption. (*Id.* at 907.)  Dr. Adams based these limitations on Clark's weakness of extremities, chest pain, and lightheadedness.  (*Id.*)  Dr. Adams further opined Clark could rarely climb, balance, stoop, crouch, kneel, crawl as a result of her "freq. lightheadedness."  (*Id.*) (emphasis in original).  Clark could occasionally

18

reach, push/pull, and perform fine and gross manipulation. (*Id.* at 909.) Dr. Adams further opined Clark must never be around heights, moving machinery, temperature extremes, or pulmonary irritants. (*Id.* at 909.) Dr. Adams noted a cane, walker, and wheelchair had not been prescribed. (*Id.*) Dr. Adams again opined Clark would need to alternate between sitting, standing, and walking at will, and needed to elevate her legs to 45 degrees at will. (*Id.*) Dr. Adams also again opined Clark experienced moderate and severe pain as a result of her frequent chest pain that would interfere with her concentration, take her off task, and cause absenteeism. (*Id.*) Clark also required additional unscheduled rest periods outside of normal breaks. (*Id.*)

## C.      State Agency Reports

On April 14, 2017, Mehr Siddiqui, M.D., opined Clark could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for four hours in an eight-hour work day, and sit for about six hours in an eight-hour work day. (*Id.* at 112, 114.) Clark's ability to push and pull was unlimited, other than shown for lifting and carrying. (*Id.* at 114.) Dr. Siddiqui further opined Clark could occasionally climb ramps/stairs and never climb ladders, ropes, or scaffolds. (*Id.*) Clark could occasionally crawl, but her ability to balance, stoop, kneel, and crouch was unlimited. (*Id.* at 112-13.) Clark must avoid all exposure to hazards. (*Id.* at 113.)

On July 19, 2017, Venkatachala Sreenivas, M.D., affirmed Dr. Siddiqui's findings on reconsideration. (*Id.* at 126-28.)

## D.      Hearing Testimony

During the September 27, 2018 hearing, Clark testified to the following:

19

- She stopped working after having a heart attack on December 23, 2016. (*Id.* at 88.) She returned to work for seven or eight days, and then had a second heart attack while at work. (*Id.* at 88-89.) She returned to work for two days after that before getting symptoms that mimicked her heart attacks, including chest pain, pain down her arms, nausea, sweating, and inability to breathe. (*Id.* at 89-90.) After that, she did not return to work. (*Id.* at 90.) Her primary care physician, Dr. Adams, did not believe it was safe for her to return to work when he felt her symptoms were not under control. (*Id.*) Her symptoms continued despite her medications. (*Id.*) Her doctors have not been able to find a combination of medications that eliminate her symptoms. (*Id.* at 91.) Her medication slows down her shortness of breath, and she takes nitroglycerin tablets for chest pain. (*Id.*) She takes approximately eight to ten nitroglycerin tablets a month. (*Id.*) The severity of her pain determines whether she takes nitroglycerin. (*Id.*) She underwent cardiac rehab for three months. (*Id.* at 93.)

- She also suffers from POTS, which causes dizziness, lightheadedness, and unstable blood flow, which made it difficult for her to stand or sit for periods of time without feeling dizzy. (*Id.* at 91.) A hemodynamic tilt test confirmed her diagnosis. (*Id.* at 92.) She becomes "very unstable" when she walks. (*Id.* at 91.) Her neuropathy causes her legs and feet to go numb and makes it difficult for her to hold things in her hands. (*Id.* at 91-92.) Her neuropathy has gotten worse since 2016. (*Id.* at 95.) She has more weakness in her legs and muscles, and the type of neuropathy she has is different. (*Id.*) She had small fiber neuropathy when first diagnosed, but now has autonomic neuropathy. (*Id.* at 96.) She also suffers from anxiety and depression. (*Id.*) She cries a lot and is very sensitive. (*Id.*) She takes a second dose of her neuropathy medication to treat her anxiety and depression. (*Id.*)

- She suffers from brain fog that causes her to forget what she is supposed to do. (*Id.* at 97.) She had some dates where she was supposed to do some things with her mother-in-law, but she forgot about them and left her mother-in-law someplace. (*Id.*) She sets alarms to remind her to take her medications and her husband takes her to her appointments. (*Id.*)

- She gets migraine headaches several times a month. (*Id.*) She takes Imitrex for them. (*Id.*)

- She used a straight cane at the hearing. (*Id.* at 92.) She had not asked for the cane, but Dr. Adams was aware of her tripping because of her neuropathy. (*Id.*) Dr. Adams preferred she have the assistance of the cane to stabilize her when she went out alone. (*Id.* at 92-93.) Dr. Adams did not prescribe the cane; she went out and bought it herself. (*Id.* at 93.)

20

- She lives with her husband and her son's dog.  (*Id.*)  They are watching the dog for another month.  (*Id.*)  Her husband takes care of the dog.  (*Id.* at 93-94.)

- She spends a typical day laying in bed or in the living room watching TV.  (*Id.* at 94.) When laying in bed, she elevates the head of the bed to keep from getting dizzy.  (*Id.*) She does not do any laundry but does some cooking when she can.  (*Id.*)  She can dress herself and has a shower chair, but only showers when her husband is home. (*Id.*)  She recently cut 12 inches off her hair so she could do her hair herself.  (*Id.*) When it was longer, she could not wash it herself because her arms would go numb and keeping her arms over her head for a long period of time caused difficulty breathing.  (*Id.* at 94-95.)  She was also unable to blow dry or style it.  (*Id.* at 95.) She does not do laundry because carrying the laundry basket down eight steps causes her to be too winded and bending up and down to load the clothes makes her dizzy. (*Id.*)

- She has gone out twice socially in the past two months.  (*Id.* at 96-97.)  She went to a baseball game when she came home.  (*Id.* at 97.)

The VE testified Clark had past work as a loan officer, branch manager, rental manager, and food and beverage manager.  (*Id.* at 99-100.)  The ALJ then posed the following hypothetical question:

> I'd like you to assume an individual who is 48 years old, has a GED equivalent of a high school education; can read, write, and perform simple arithmetic; has the work background to which you testified; this individual is able to do work of sedentary exertional requirements plus additional non-exertional limitations specifically no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no concentrated exposure to temperature extremes, humidity, environmental pollutants, high background noise, or strong lighting as in a factory setting; and no exposure to hazards such as heights, machinery, commercial driving; I specifically find no severe mental limitations. Could this individual perform past work?

(*Id.* at 100.)

The VE testified the hypothetical individual would not be able to perform Clark's past work as a loan officer, branch manager, rental manager, and food and beverage manager.  (*Id.* at 101.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the

21

economy, such as food and beverage order clerk, charge account clerk, and sample title document preparer. (*Id.*)

The ALJ modified the first hypothetical to add that as a result of symptoms of the individual's medically determinable impairments, the individual would be off-task at least 20% of the time. (*Id.* at 102.) The VE testified there would be no jobs for such an individual. (*Id.*) Clark's counsel asked the VE what effect on the representative jobs there would be if the individual in the first hypothetical was absent from work at least twice a month. (*Id.*) The VE testified there would be no jobs for such an individual. (*Id.*) Clark's counsel also asked the VE what impact there would be on the representative jobs if the individual from the first hypothetical was limited to occasional or less reaching, pushing, and pulling. (*Id.*) The VE testified there would be no jobs for such an individual. (*Id.* at 103.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. § 404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Clark was insured on her alleged disability onset date, December 31, 2016, and remained insured through September 30, 2022, her date last insured ("DLI").  (Tr. 65-66.)  Therefore, in order to be entitled to POD and DIB, Clark must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement

to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2. The claimant has not engaged in substantial gainful activity since December 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: ischemic heart disease, status post myocardial infarction; postural orthostatic tachycardia syndrome (POTS); diabetes mellitus with mild peripheral neuropathy; hypertension; and migraine (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545) to perform sedentary work as defined in 20 CFR 404.1567(a), except: she can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch and crawl; cannot have concentrated exposure to temperature extremes, humidity, environmental pollutants, high background noise or strong lighting, as in a factory setting; and she must avoid all exposure to hazards (heights, machinery, commercial driving) (20 CFR 404.1569a).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The individual was born on May **, 1970 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

24

9.     Transferability of job skills is not material to the determination of disability
       because using the Medical-Vocational Rules as a framework supports a finding
       that the claimant is "not disabled," whether or not the claimant has transferable
       job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual
       functional capacity, there are jobs that exist in significant numbers in the national
       economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security
       Act, from December 31, 2016, through the date of this decision (20 CFR
       404.1520(g)).

(Tr. 67-79.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social

Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r

of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

2009).   Substantial evidence has been defined as "'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y

of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings

are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

25

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot

26

determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Clark's first two assignments of error concern the ALJ's treatment of the opinions rendered by her treating primary care physician, Dr. Adams.  (Doc. No. 17 at 1.)  Clark asserts the ALJ erred by failing to specify the amount of weight assigned to Dr. Adams' opinions.  (*Id.* at 13.)  "Just as important[ly]," Clark argues the ALJ erred in excluding or ignoring Dr. Adams' findings in formulating the RFC, despite the opinions being "quite valid" and "consistent with and supported by the medical evidence."  (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Dr. Adams' opinions and the ALJ's analysis "complied with the applicable regulations."  (Doc. No. 18 at 14.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[3] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.* In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Social Security Ruling ("SSR") 96–6p, 1996 WL 374180 at *2 (Soc. Sec. Admin. July 2, 1996).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[5] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley,* 581 F.3d at 408.[6] *See also Gayheart,* 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion

---

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

[5] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[7]

---

[7] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

The ALJ evaluated Dr. Adams' opinions as follows:

> As for the opinion evidence, Dr. Adams completed a Medical Source Statement: Patient's Physical Capacity on July 17, 2017 (Exhibit 12F). The claimant has chest pain, shortness of breath, palpitations, and numbness of extremities. Dr. Adams opined the claimant could occasionally lift and carry five pounds; could stand or walk for a ½ hour of an eight-hour workday; could sit for four hours of an eight-hour workday; could rarely to never climb, balance, stoop, crouch, kneel or crawl; could rarely reach, push, pull, or perform fine or gross manipulation; should avoid heights, moving machinery, temperature extremes, pulmonary irritants and noise; and that her pain would interfere with concentration, take her off-task, and cause absenteeism, that she would need to elevate her legs at a 45

---

contradict the opinion' may be considered in assessing any type of medical opinion.  *Id*.  § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

degree ankle, that she would require additional unscheduled rest periods, and that she was unable to work an eight-hour workday.

Dr. Adams completed another Medical Source Statement: Patient's Physical Capacity on May 15, 2018 (Exhibit 18F), indicating that the claimant spends most of her days in bed; she is unable to stand or walk more than 15 steps; she is unable to work an eight-hour workday; and that her limitations remained unchanged from July 17, 2017, except she can stand or walk for two hours in an eight-hour workday, could sit for two hours in an eight-hour workday, and has been prescribed a cane, walker and wheelchair.

Dr. Adams then opined on April 25, 2018 that the claimant is totally disabled (Exhibit 19F, p. 5), as she is unable to get out of bed and stand or walk for more than 15 minutes or do any physical activity without chest pain, fatigue, tachycardia, hypotension, lightheadedness, or weakness of extremities.

* * *

Dr. Adams completed a Medical Source Statement: Patient's Physical Capacity on August 23, 2018 (Exhibit 30F) indicating that the claimant has weakness of the extremities, chest pain and lightheadedness; that she could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; that she could stand or walk for four hours of an eight-hour workday; that she could sit for eight hours of an eight-hour workday; that she could rarely climb, balance, stoop, crouch, kneel or crawl; that she could occasionally reach, push, pull and perform fine or gross manipulation; that she should avoid heights, moving machinery, temperature extremes and pulmonary irritants; that her moderate to severe pain would interfere with her concentration, take her off-task and cause absenteeism; that she would need to elevate her legs at 45 degrees; and that she would require additional unscheduled rest periods.

The undersigned finds that the medical opinions of Dr. Adams are discrepant, including his assessments of the claimant's capacity and whether or not she needs a cane (Exhibits 12F, 14F, l8F and 30F), although Dr. Adams acknowledged that the claimant does not have severe mental limitations (Exhibit 3lF). Under authority of 20 CDR 404.1527, the undersigned rejects the opinions of Dr. Adams and Dr. Shields (Exhibits 19F and 29F) to the effect that the claimant is disabled.

(Tr. 76.)

31

As an initial matter, the ALJ erred in failing to identify Dr. Adams as a treating source.[8]  *Blakley*, 581 F.3d at 408.  Although Clark does not raise this error in her brief, the Court can raise such glaring errors *sua sponte*.  *See, e.g., Morris v. Comm'r of Soc. Sec.*, No. 2:18-12090, 2019 WL 3755272, at *13 (E.D. Mich. July 18, 2019) (collecting cases), *report and recommendation adopted by* 2019 WL 3753806 (E.D. Mich. Aug. 8, 2019); *Naddra v. Comm'r of Soc. Sec.*, No. 1:16-cv-340, 2016 WL 11268204, at *3 (S.D. Ohio Dec. 22, 2016) (citation omitted), *report and recommendation adopted by* 2017 WL 1194708 (S.D. Ohio Mar. 31, 2017). While this Court does not generally raise issues *sua sponte*, it is warranted in this case based on a clear error of law.  *See Naddra*, 2016 WL 11268204, at *3.  Furthermore, even more compelling than the case in *Naddra*, this error is related to the claims Clark raised regarding the ALJ's treatment of Dr. Adams' opinions.  *Cf. id.*

The ALJ compounded this initial error by failing to articulate how much weight (if any) he assigned to Dr. Adams' opinions.  As the Sixth Circuit has explained, "[i]f the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley*, 581 F.3d at 406.  *See also Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. March 17, 2016) ("An ALJ must also determine what weight – if not controlling– to give the treating physician's opinion" by applying the factors set forth in 20 C.F.R. § 404.1527); *Kalmbach v. Comm'r of Soc. Sec.*,

---

[8] The Commissioner does not dispute that Dr. Adams constituted a treating source at the time he issued his opinions.  (Doc. No. 18 at 14-19.)

32

409 F. App'x 852, 860 (6th Cir. Jan. 7, 2011) (finding that "[e]ven if the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much weight to give it" using the factors set forth in 20 CFR § 404.1527); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. April 28, 2010) (same); *Roush v. Barnhart*, 326 F. Supp. 2d 858, 867 (S.D. Ohio 2004) ("Even where the ALJ determines not to give the opinions of a treating physician 'controlling' weight, Social Security regulations and rules nonetheless require the ALJ to determine and articulate the amount of weight given to the opinions.")  Indeed, federal courts have not hesitated to remand where an ALJ fails to specify the amount of weight accorded a treating physician opinion and discuss the regulatory factors set forth in 20 CFR § 404.1527.  *See, e.g., Quattlebaum v. Comm'r of Soc. Sec.*, 850 F. Supp. 2d 763, 771 (S.D. Ohio 2011) (remanding where "the ALJ's decision does not reflect an analysis of the regulatory factors or an indication of the weight he actually accorded to [the treating physician opinion]."); *Harmon v. Astrue*, No. 5:09CV2765, 2011 WL 834138, at *9 (N.D. Ohio Feb. 8, 2011), *report and recommendation adopted by* 2011 WL 825710 (N.D. Ohio Mar. 4, 2011) (remanding where ALJ failed to articulate the weight given to the treating source opinion and failed to consider all of the appropriate factors in weighing the opinion); *Saunders v. Comm'r of Soc. Sec.*, No. 2:14-cv-493, 2015 WL 4450656, at *6 (S.D. Ohio July 20, 2015), *report and recommendation adopted by* 2015 WL 5582315 (S.D. Ohio Sept. 23, 2015) (remanding where ALJ failed to articulate the weight assigned to treating physician opinion); *Horn v. Comm'r of Soc. Sec.*, No. 1:13cv610, 2014 WL 5107598, at *7 (S.D. Ohio Oct. 10, 2014) (finding that ""[w]hile it is implicitly clear that the ALJ rejected virtually all of [the treating source]'s opinions, remand is required because he failed to explicitly state what weight he was giving to [those] opinions.").

Although a comparison of the RFC in the instant case and Dr. Adams' opinions indicates the ALJ rejected most of Dr. Adams' proposed limitations, nowhere in the decision does the ALJ specify the amount of weight given to any of Dr. Adams' opinions.  As a result, "any reader of [the ALJ decision] would be left wondering whether the ALJ accorded some weight, little weight, or no weight to [Dr. Adams'] opinion[s], and would be clueless as the reasons underlying the accorded level of weight." *Lambert ex rel. Lambert v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 671, 685 (S.D. Ohio 2012).  *See also Shlimon v. Comm'r of Soc. Sec.*, No. 12-13806, 2013 WL 3285136, at *13 (E.D. Mich. June 28, 2013) ("[T]he ALJ did not explicitly assign a weight to Dr. Steppe's opinion, which, of course, makes it difficult for the Court to carry out its duty of determining whether substantial evidence supports the weight assigned").

Moreover, compounding his error, the ALJ in the instant case failed to consider many of the factors set forth in 20 C.F.R. § 404.1527.  Specifically, the ALJ offered no discussion of the length of the treatment relationship, the frequency of the examinations, the nature and extent of the treatment relationship, or other factors such as Dr. Adams' familiarity with other information in Clark's treatment record.  The ALJ's failure to either articulate the amount of weight given to Dr. Adams' opinions or discuss many of the factors set forth in 20 C.F.R. § 404.1527 runs contrary to Social Security regulations and rules and inhibits proper judicial review.  *See, e.g., Blakley*, 581 F.3d at 406; *Quattlebaum*, 850 F. Supp. 2d at 771; *Harmon*, 2011 WL 834138, at *9.

Additionally, while the ALJ offered some reasons for rejecting Dr. Adams' opinions regarding Clark's capacity and her need for a cane, the decision failed to address several of the other specific functional limitations consistently set forth in Dr. Adams' opinions.  Specifically, the ALJ failed to

34

sufficiently discuss the basis for his implicit rejection of Dr. Adams' opinions that Clark would need to alternate between positions at will, that Clark's severe pain would interfere with her concentration, take her off task, and cause absenteeism, that Clark would need to elevate her legs to 45 degrees at will, and that Clark would need additional breaks.  (Tr. 520-21, 654-55, 907-09.)  While the ALJ's finding that the opinions were "discrepant" may explain why the ALJ implicitly rejected Dr. Adams' opinions regarding Clark's abilities to lift, carry, push, pull, stand, walk, finger, and feel, that does not explain the ALJ's rejection of the portions of Dr. Adams' opinions that remained consistent.

The Commissioner also argues remand is not required because the ALJ's findings regarding the medical evidence provides support for his rejection of Dr. Adams' opinions.  The Court rejects this argument.  While the ALJ recited some of the medical evidence in the decision, he failed to offer any *explanation* for his apparent conclusion that Dr. Adams' opinions regarding Clark's functional limitations were inconsistent with that evidence.  As courts within this District have held, an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected." *Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013).  Nor does the Commissioner's *post hoc* arguments regarding inconsistencies between the medical record and Dr. Adams' opinions.  As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn*, 2013 WL 3967282 at *8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

In sum, for all these reasons, the Court find the ALJ failed to follow Social Security regulations and rules, as well as the law of this circuit, in evaluating Dr. Adams' opinions.  Remand is required.

As this matter is being remanded for further proceedings for proper consideration and articulation of Dr. Adams' opinions, and in the interests of judicial economy, the Court will not address Clark's remaining assignment of error.

### VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

**IT IS SO ORDERED.**

Date: February 3, 2021                           *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

36